13 A.3d 428

ESTATE OF NAITIL DESIR, BY AND THROUGH ITS LAWFULLY APPOINTED ADMINISTRATRIX EDMONDE ESTIVERNE, AND EDMONDE ESTIVERNE, INDIVIDUALLY AND ON BEHALF OF THE HEIRS AT LAW AND DEPENDENTS OF NAITIL DESIR, PLAINTIFFS, AND ESTATE OF COSME NOVALY, BY AND THROUGH ITS LAWFULLY APPOINTED ADMINISTRATOR WILNER NOVALY, AND WILNER NOVALY, INDIVIDUALLY AND ON BEHALF OF THE HEIRS AT LAW AND DEPENDENTS OF COSME NOVALY, PLAINTIFFS–APPELLANTS, v. JEAN ROBERT VERTUS, INDIVIDUALLY AND ON BEHALF OF VERTUS FINANCIAL SERVICES AND VERTUS FINANCIAL SERVICES, DEFENDANTS–RESPONDENTS. AND JEAN ROBERT VERTUS, DEFENDANT/THIRD–PARTY PLAINTIFF, v. EARL EASTERLING, LOUIS BOGGS AND LETRAY EVANS, THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued November 1, 2010—Decided March 7, 2011.

---

Before Judges RODRÍGUEZ, GRALL and C.L. MINIMAN.

*Alexandra A. Conti* argued the cause for appellants (*Conti & Conti, P.C.*, attorneys; *David V. Conti, Jr.*, of counsel and on the brief).

*John J. Ronca, Jr.*, argued the cause for respondents (*Ronca, Hanley, Nolan & Zaremba, L.L.P.*, attorneys; *Mr. Ronca*, on the brief).

The opinion of the court was delivered by

GRALL, J.A.D.

Cosme Novaly, a friend and neighbor of defendant Jean Robert Vertus, was shot in front of Vertus Financial Services by a robber leaving the premises. Novaly was there because he was lending assistance to Vertus, who had come to Novaly and told him that he thought "something was going on" in the apartment that he used as his residence and place of business. Novaly died from the gunshot wound, and his estate filed a complaint charging Vertus and his business with negligence.

On defendants' motion for summary judgment, the trial judge concluded that defendants owed no duty of care to Novaly and entered judgment in their favor. Novaly's estate appeals. We hold that one who has reason to believe that an intruder on his premises poses a danger to others owes a duty of reasonable care to a friend whom he brings to the danger by a request for assistance.[1] Accordingly, we reverse.

The factual statement that follows is drawn from Vertus's deposition testimony. At the time of this incident, he operated a "financial services" business out of his second-floor apartment in a high-crime area of Irvington. In fact, Vertus had been robbed and stabbed while working there three years before the incident that led to Novaly's death. In Vertus's words, in Irvington "you have to be scared for your life."

The events at issue here started at around 5:00 p.m. on a September evening. Vertus had just finished doing business with

---

[1] A jury considered and rejected claims of the estate of Naitil Desir, a customer of Vertus killed during the robbery inside the premises. Desir's estate does not appeal from that judgment.

a client at his dining room table. As the client walked toward the living room and the stairs to leave, Vertus saw her "step back." Although he did not see or hear anything else, he "knew inside" that something was wrong because "if you have to open the door and ... you see something, you just ... step back." He feared that "[a] robbery or something" was about to take place.

Vertus did not follow the client; he left by way of side stairs leading to the first-floor apartment to look for a telephone and call 911 because he thought "something happened." Vertus knocked, but his downstairs neighbor did not respond. He then sought help from Novaly and his roommate Mr. St. Louis, who lived three houses away. Both had done business with him, and they were very close to him—in his words, "like family." He did not stop at the first house because he knew those neighbors did not have a phone, and he did not stop at the second house because the residents were elderly.

When Vertus arrived, he told Novaly and St. Louis that "something" was going on in his apartment. He did not ask them to call 911 because he claimed to not know what was going on, but he did ask them to call his office to see if someone could pick up the phone. They complied, but the line was busy. Novaly and St. Louis left Vertus in their apartment because he was "scared," and they went outside to see what was happening.

Vertus acknowledged that he had not told his neighbors what he thought was happening. He just told them he saw the client "move back" and that "the way she moved it seemed like something [was] going on in [his] business."

When asked if he had requested help from Novaly and St. Louis, Vertus responded: "Well, they were helping me. I mean, I went downstairs, they g[a]ve me the telephone and they left." He also said that he thought Novaly and St. Louis were going in "the direction of [his] business" when they left, because he had "c[o]me to them to ask, you know, for help." There is no evidence that either Novaly or St. Louis had any law enforcement training or experience.

Soon after his neighbors left him, Vertus heard a gunshot and dialed 911. He stayed in Novaly's basement apartment until he heard sirens. When he went outside, he saw Novaly lying on his back on the ground suffering from a gunshot wound, and he applied pressure to the wound until an ambulance arrived. Novaly died from his injuries twenty-four days later. The parties agree that three intruders entered Vertus's business, assaulted several clients, shot Desir, demanded money and that Novaly was shot outside on the sidewalk.

In reviewing a grant of summary judgment, this court uses the same standards as the trial court. *Kramer v. Ciba–Geigy Corp.,* 371 *N.J.Super.* 580, 602, 854 *A.*2d 948 (App.Div.2004). The trial judge concluded that defendants were entitled to judgment as a matter of law because they had no duty to Novaly on these facts. That is a determination of law and we owe no deference to the trial judge's conclusion. *Frederick v. Smith,* 416 *N.J.Super.* 594, 599 (App.Div.2010).

The estate does not contend that Vertus violated a duty as a business proprietor to secure the premises from criminal attacks. *See generally Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 519, 694 *A.*2d 1017 (1997). Nor does the estate contend that Vertus's negligence was partially responsible for causing the robbery, which would provide a basis for concluding that Vertus owed Novaly a duty under the rescue doctrine. *Saltsman v. Corazo,* 317 *N.J.Super.* 237, 248–49, 721 *A.*2d 1000 (App.Div.1998).

The estate instead argues that we should find a duty because Vertus, a business proprietor and resident of a premises that he thought was being robbed, asked Novaly to lend assistance under circumstances that Vertus knew or should have recognized exposed Novaly to the risk of injury at the hands of intruders. As we understand the claim, it is based on Vertus's conduct that created an unreasonable risk of injury to Novaly by bringing him into the dangerous situation posed by the robbers at Vertus Financial Services.

A general " 'purpose of the tort laws is to encourage reasonable conduct, and, conversely, to discourage conduct that creates an unreasonable risk of injury to others.' " *Sciarrotta v. Global Spectrum*, 194 *N.J.* 345, 357, 944 *A.*2d 630 (2008) (quoting *Gantes v. Kason Corp.*, 145 *N.J.* 478, 489, 679 *A.*2d 106 (1996)). "That deterrent goal of the tort laws is effectuated through the recognition of a duty to exercise reasonable care and the imposition of liability for the breach of such a duty." *Gantes, supra,* 145 *N.J.* at 489, 679 *A.*2d 106 (stating the principle in discussing choice of law in a products liability case); *see Sciarrotta, supra,* 194 *N.J.* at 357, 944 *A.*2d 630 (reiterating the principle in discussing the contours of the duty owed to spectators at a sporting event). This State's law governing the duties of occupiers of land and the rescue doctrine has been developed to effectuate that fundamental purpose. *Olivo v. Owens–Illinois, Inc.,* 186 *N.J.* 394, 402, 895 *A.*2d 1143 (2006) (noting that the duties of landowners should be consistent with the "fundamental purpose" of "deter[ring] conduct that creates an unreasonable risk of injury to others" (internal quotations omitted)); *Saltsman, supra,* 317 *N.J.Super.* at 249, 721 *A.*2d 1000 (extending the rescue doctrine to permit recovery from a "rescued victim" who created an unreasonable risk of injury to others by being "completely, or partially, at fault for creating the peril that invited the rescue").

The question whether a duty should be imposed to discourage unreasonable risk of injury to others in a particular circumstance is a one of "fairness and policy." *Snyder v. Amer. Ass'n of Blood Banks,* 144 *N.J.* 269, 292, 676 *A.*2d 1036 (1996). Several factors, including "the relationship of the parties, the nature of the attendant risk [and] the opportunity and ability to exercise care," are relevant. *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993). The foreseeability of harm to another is also an important determinant; the " 'probability of injury . . . [to] another is the basis for the law's creation of a duty to avoid such injury, and foresight of harm lies at the foundation of the duty to use care and therefore of negligence.' "

*Hill v. Yaskin,* 75 *N.J.* 139, 144, 380 *A.*2d 1107 (1977) (quoting 57 *Am.Jur.2d Negligence* § 58 (1970)).

The Supreme Court has applied the foregoing principles and held that a landowner has a duty to one injured off his premises by a dangerous condition on the site when an individual or identifiable class of individuals is foreseeably at risk of being harmed by the condition. *Olivo, supra,* 186 *N.J.* at 403–05, 895 *A.*2d 1143. On similar reasoning, this court has held that a person who negligently imperils himself and invites a foreseeable rescue owes a duty of reasonable care to the rescuer. *Saltsman, supra,* 317 *N.J.Super.* at 247–48, 721 *A.*2d 1000; *see Ruiz v. Mero,* 189 *N.J.* 525, 528–29, 917 *A.*2d 239 (2007) (discussing the foreseeability of rescue that is the foundation of the rescue doctrine). Moreover, the Supreme Court has acknowledged "the existence of a duty predicated on foreseeability of an increased hazard" to bystanders created by one who contributes, by leaving her keys in a car parked at night in a high-crime area, to the theft and subsequent mishandling of an automobile. *Hill, supra,* 75 *N.J.* at 147, 380 *A.*2d 1107.

This court has previously concluded that a wife confronted with the potential of her husband becoming violent because he had stopped taking medication he needed to control that behavior owed a duty to a nephew she exposed to the danger by requesting his assistance to get her husband to take his medicine. *Arvanitis v. Hios,* 307 *N.J.Super.* 577, 580–81, 587, 705 *A.*2d 355 (App.Div. 1998). As in *Hill,* the duty imposed was based on conduct of the actor that resulted in exposure of the injured party to the foreseeably dangerous acts of another. In *Hill,* it was defendant's leaving of keys in her car that facilitated the car's theft and the thief's reckless driving that caused injury to an innocent plaintiff. 75 *N.J.* at 140–41, 147, 380 *A.*2d 1107. In *Arvanitis,* it was the wife's requesting the "plaintiff's assistance in a potentially explosive situation and without warning him." 307 *N.J.Super.* at 587, 705 *A.*2d 355.

318

This conduct-based duty to refrain from exposing others to the foreseeable criminal or negligent acts of third parties is recognized elsewhere. For example, it has been said that when the "state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Bowers v. DeVito*, 686 *F*.2d 616, 618 (7th Cir.1982); *see Wood v. Ostrander*, 879 *F*.2d 583, 586, 590 (9th Cir.1989) (holding that by stranding a passenger of an intoxicated driver in a high-crime area the police acquired a duty to afford her some measure of peace and safety).

Similarly, the *Restatement* recognizes that under certain circumstances an actor is negligent when his or her conduct leads another to a course of conduct that results in an unreasonable risk of injury. *Restatement (Second) of Torts* § 303 (1965).

An act is negligent if the actor intends it to affect, or realizes or should realize it is likely to affect, the conduct of another, a third person, or an animal in such a manner as to create an unreasonable risk of harm to the other.

[*Ibid.*]

One illustration of the principle offered in the *Restatement* is that of a poor swimmer "who intentionally goes beyond his depth in a heavy surf" and thereby invites a rescue effort by one who then suffers exhaustion leading to illness. *Id.* at illustration 2. Casting this principle of negligence in terms of duty, an actor has a duty to refrain from conduct that he or she realizes or should realize is likely to evoke a response from another that creates a risk of injury to that person or others.

A comment to Section 303 notes its application when the harmful response is evoked by "stimulus of the situation created by the actor." *Id.* at comment d. In our view, however, even if a person who seeks assistance from an untrained person not present at the scene has not contributed to the creation of the peril, he has, by the stimulus of his conduct in requesting assistance, acted to bring the untrained assistant to the danger. As we held in *Arvanitis*, one can initiate danger by requesting assistance in "a potentially

explosive situation and without warning" to the would-be assistor. *Arvanitis, supra,* 307 *N.J.Super.* at 587, 705 *A.*2d 355.

We acknowledge that this case is different than *Arvanitis* in that the plaintiff-nephew lent assistance and was injured by his violent uncle in the home of the defendant-aunt who summoned him to the danger. *Id.* at 580–81, 705 *A.*2d 355. Thus, we primarily analyzed that case under the doctrines of premises liability. *Id.* at 582–84, 705 *A.*2d 355. Here, Novaly was shot by one of the robbers outside the premises of Vertus Financial Services, making a straightforward premises-liability analysis inapplicable.

But the fact that the shooting occurred on the sidewalk rather than inside is immaterial. Our Supreme Court's "desire to maintain fairness and justness in our tort jurisprudence" has led it to conclude "that premises liability should no longer be limited by strict adherence to the traditional and rigid common law classifications." *Olivo, supra,* 186 *N.J.* at 401, 895 *A.*2d 1143. Instead, our courts focus on foreseeability in defining the scope of duty. *Id.* at 403, 895 *A.*2d 1143. Thus, in *Olivo,* the Court recognized that when a danger posed by a condition on property poses a foreseeable risk to an identifiable person off the premises, a duty to that person arises. *Id.* at 404–05, 895 *A.*2d 1143.

The Court looked to its earlier decision in *Hill* to explain the relationship between foreseeability and duty: "The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care." *Hill, supra,* 75 *N.J.* at 144, 380 *A.*2d 1107 (internal quotations omitted); *see Olivo, supra,* 186 *N.J.* at 403, 895 *A.*2d 1143. The question is whether "a reasonably prudent and careful person should have anticipated, under the same or similar circumstances, that injury to the plaintiff or to those in a like situation would probably result" from his or her conduct. *Hill, supra,* 75 *N.J.* at 144, 380 *A.*2d 1107 (internal quotations omitted).

The facts in this case support the imposition of a duty of reasonable care based on Vertus's conduct that he knew or should have known would bring Novaly to the danger that caused his injury and death. Vertus acknowledges that he went to Novaly, a friend and neighbor, who was in the safety of his own home and not aware of or endangered by the events that led Vertus to flee from his apartment and seek assistance. While Vertus never acknowledged that he knew there was a robbery in progress, he admitted that from what he saw he was scared and thought that there was. Vertus passed by the house closest to his because that neighbor did not have a phone, and he passed by the second house because those neighbors were elderly and, one might infer, because he thought the elderly couple could or would not assist. Instead, he went to the home of Novaly and St. Louis who were his friends and clients. Vertus told them "something was going on" in his apartment and described what he saw, but he did not say that the something he feared was a robbery. Vertus asked Novaly and St. Louis to call his business to find out what was happening; he did not expressly ask them for additional help because they were already helping him. When the phone call to Vertus's apartment went unanswered, Novaly and St. Louis left to see what was happening. Vertus admits that he thought they were going to his business where he believed a robbery was underway yet he did nothing to warn or stop them, even though he had no reason to believe that either Novaly or St. Louis was better able to respond to the situation than he.

The factors most pertinent to duty—foreseeability of the harm, the relationship between the parties, and opportunity and ability to exercise care—warrant imposition of a duty here. Vertus had a relationship with Novaly and St. Louis that led him to expect they would help him, and he knew that by responding as they did they were leaving the safety of their home to help him and exposing themselves to what he thought was a robbery. As noted above, we held that Mrs. Arvanitis owed a duty to her nephew because she called him to assist her in getting her husband to take

medication he needed to control his tendency to do violence to others. *Arvanitis, supra,* 307 *N.J.Super.* at 587, 705 *A.*2d 355. By her request for help, she caused him to become involved in a foreseeably dangerous situation with which he had no previous connection. We see no difference in the degree of foreseeability of harm or the relationships of the parties involved in this case and *Arvanitis* that would warrant a different result here. The principle is the same: where an imperiled person draws in another to his predicament, it is foreseeable that the person drawn in will be injured unless the victim exercises reasonable care.

Nor do we discern a difference pertinent to fairness and policy between this case and *Arvanitis*. In both cases, the defendants asked for help in addressing a dangerous situation on their premises that they had played no role in creating. But both created danger to a specific individual by affirmatively acting to draw an untrained and unsuspecting person who was not previously endangered into the dangerous situation. Because of Vertus's affirmative conduct, there is nothing unfair about imposing a duty of reasonable care toward an untrained and unsuspecting neighbor nor is it contrary to the purpose of deterring conduct that exposes others to an unreasonable risk of bodily injury. The person seeking assistance is in a position to know the nature of the peril, and the person summoned from afar has no information other than that conveyed with the request.[2]

We briefly consider the scope of the duty of reasonable care owed here. In general, the scope of the duty is defined by what a reasonably prudent person would do under the same or similar circumstances. *Weinberg v. Dinger,* 106 *N.J.* 469, 484, 524 *A.*2d 366 (1987) (noting that this is the standard of care "ordinarily

[2] The result might be different if the actor requested assistance from a trained professional with superior ability to exercise care under the circumstances, such as a police officer.

imposed by negligence law"). Here, the question is what the reasonably prudent person would do to avert a risk of harm to a person he asks for help. Certainly, obligating one who seeks assistance to alert the individual summoned to what he knows and should know about the nature of the danger is consistent with *Arvanitis, supra,* 307 *N.J.Super.* at 582–85, 705 *A.*2d 355, and *Olivo, supra,* 186 *N.J.* at 408, 895 *A.*2d 1143 (recognizing that an employer whose workers deal with asbestos has a duty to alert them to the danger to a spouse who handles the clothes at their home). A reasonably prudent person would also recognize other alternatives, such as suggesting placement of a 911 call from a place of safety or making it clear that the request was not for help that includes rushing to the danger.

Defendants argue that even if Vertus had a duty he did not breach it because he told Novaly what he knew and he had "no specific knowledge of what was happening in his apartment" as he did not see the intruders, their demeanor, or whether they were armed. We disagree. A reasonable jury could infer from Vertus's conduct and statements that he was aware that the "something" going on was what he admitted he thought was taking place—a robbery. At this point in the litigation, the estate is entitled to all favorable inferences. *R.* 4:46–2(c).

The orders under review are reversed and the case is remanded to the Law Division.