705 A.2d 355

GEORGE P. ARVANITIS AND HRISTINA ARVANITIS,
PLAINTIFFS–APPELLANTS, v. GEORGE HIOS AND
EFSTATHIA HIOS, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 6, 1998—Decided January 22, 1998.

Before Judges PRESSLER, CONLEY and WALLACE.

*Roberta L. Tarkan*, argued the cause for appellants (*Myers & Pico*, attorneys; *Deborah L. Pico*, on the brief).

*Robert K. Walsh*, argued the cause for respondents (*Bashwiner and Woods*, attorneys; *Mr. Walsh*, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiff George Arvanitis (plaintiff) was injured while attempting to assist defendant Efstathia Hios (Efstathia) in convincing her husband, defendant George Hios (George), to take his medication. Plaintiff and his wife, Hristina Arvanitis, appeal summary judgments granted in favor of both defendants. We reverse.

Since the appeal arises from summary judgments, we must decide " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 533, 666 *A.*2d 146 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 251–52,

106 *S.Ct.* 2505, 2512, 91 *L. Ed.*2d 202, 214 (1986)). The evidence, of course, must be considered most favorably towards the opposing party. *Brill, supra,* 142 *N.J.* at 523–24, 666 *A.*2d 146.

That evidence, as presented to the motion judge, is not complex. In 1992, following a recurrence of a 1985 episode of hallucinations, George was diagnosed as a manic depressive. Lithium was prescribed to control his condition. During the earlier episode, George had become violent and had "grabbed [Efstathia] by the throat like [he] was choking her...." A few weeks before the incident during which plaintiff was injured, George voluntarily stopped taking his medication. According to Efstathia's police statement following the incident, George "had been striking her lately." It is a reasonable inference that George's violence was a product of his not taking his medication.

There is no indication that plaintiff, who is George's nephew, was aware of the 1985 violent conduct or the then current violence on the part of George. He did know that George had stopped taking his medication and "was losing control somehow," and until the incident on May 20, 1993, he believed that George generally was "okay."

On the day of the incident, Efstathia called plaintiff and asked him to come to her house because George was "a little bit upset" and would not take his medication. After receiving the phone call, plaintiff went first to George's deli shop. George was there and after they had coffee, he closed the shop. When plaintiff asked him how he was, George told him he was "not feeling that well" and that he did not know what was wrong or what was bothering him. Other than that, George seemed fine to plaintiff.

They both then went to the defendants' home, where Efstathia asked plaintiff to come in with George. He came in and they sat down in the living room. At that point, Efstathia and plaintiff attempted to persuade George to take his medication. George refused and became angry. He suddenly stood up to knock the medication out of his wife's hand and reached out to strike her. Plaintiff stood up to intercede. During the commotion, his leg

broke through defendants' glass coffee table and was cut by the glass. During his deposition testimony, plaintiff could not articulate exactly how he cut his leg. He said:

> [George] wants to take the medication from his wife's hand, throw them up and then hit her ... I got up and stopped him ... I told him stop, don't do this type of nonsense ... I found myself with my foot cut on top of the table ... I must have lost my balance. The table was in front of me, and as I turn around was holding him, I lost my balance and I fell on the table.

And in his answers to interrogatories, he explained:

> Defendant would not take his medication and was becoming very agitated. Defendant became violent and stuck his wife. During the commotion, I slipped and fell into the glass table.

## I

During oral argument on the summary judgment as to Efstathia, plaintiff argued that Efstathia "knew of her husband's propensity for violence when he wasn't on the medication," and not only did not warn him of that but invited him to come in and help her try to get George to take his medication. Those circumstances, he urged, created a duty of care on Efstathia's part which she breached by either not warning him or by requesting his help. The motion judge, however, responded that plaintiff "doesn't even know how he got his foot cut," and then engaged in the following exchange:

> [PLAINTIFF'S ATTORNEY]: No, I understand that, but that's why I don't think that you can grant summary judgment. It's a Jury question.
>
> THE COURT: You watch me. You don't think so? You watch me.
>
> [COUNSEL]: It's a Jury question.
>
> THE COURT: It is not a Jury question until you show me that there's a breach of a duty. The motion is granted.

A prerequisite to recovery on a negligence theory is, of course, a duty owed by a defendant to a plaintiff. *J.S. v. R.T.H.*, 301 *N.J.Super.* 150, 154, 693 *A.*2d 1191 (App.Div.), *certif. granted,* 151 *N.J.* 464, 700 *A.*2d 876 (1997). The existence of a duty is a question of law to be determined by a judge and, ultimately, is a question of fairness and policy. *Snyder v. American Ass'n of Blood Banks,* 144 *N.J.* 269, 292, 676 *A.*2d 1036 (1996); *Dunphy v.*

*Gregor,* 136 *N.J.* 99, 108, 642 *A.*2d 372 (1994). Ordinarily, on the other hand, whether there was a breach of the duty, foreseeability, and proximate cause are issues "peculiarly within the competence of a jury." *Anderson v. Sammy Redd & Assocs.,* 278 *N.J.Super.* 50, 56, 650 *A.*2d 376 (App.Div.1994), *certif. denied,* 139 *N.J.* 441, 655 *A.*2d 444 (1995).

The parties have addressed Efstathia's duty of care from the perspective of the traditional common law concepts applicable to a landowner towards a person on his or her property. Historically, whether a duty exists and to what extent has been measured by the right of that person to be on the property, *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 433, 625 *A.*2d 1110 (1993), with the status of the person determined to be a business invitee, licensee, or trespasser. *Ibid.*

The parties seem to agree that plaintiff should be considered a social guest on defendants' property. In this respect:

> The social guest enjoys the hospitality of the host and expects that the host will take the same care of him as he does of himself and his family. *However, the host must warn a social guest of risks of harm or dangerous conditions of which the host has knowledge and the guest is unaware.*
>
> [*Benedict v. Podwats,* 109 *N.J.Super.* 402, 407, 263 *A.*2d 486 (App.Div.), *aff'd,* 57 *N.J.* 219, 271 *A.*2d 417 (1970) (emphasis added).]

Moreover, as the Supreme Court observed in *Hopkins v. Fox & Lazo Realtors, supra,* " 'the historical classifications of the degrees of care owing to visitors upon land ... are undergoing gradual change in the law in favor of a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others.' " 132 *N.J.* at 435, 625 *A.*2d 1110 (quoting *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 277, 445 *A.*2d 1141 (1982)). *But see Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 515, 694 *A.*2d 1017 (1997) ("[a]lthough we do not heavily rely on the common law classification of the [injured party] as an invitee, we cannot disregard that fact.").

Our recent decision in *J.S. v. R.T.H., supra,* 301 *N.J.Super.* 150, 693 *A.*2d 1191, is instructive. In *J.S.,* plaintiffs, two young girls, were sexually assaulted by a neighbor for more than a year.

Plaintiffs' parents brought an action against the neighbor and his wife, alleging that the wife was negligent because she knew of her husband's history of pedophilia and should have either warned the children or taken steps to protect them. Reversing the summary judgment granted in favor of the wife, we held that under the circumstances set forth by the plaintiffs, the wife did have a duty to take reasonable steps to prevent harm, and her knowledge or awareness of her husband's predilections was a disputed material fact. *Id.* at 154, 693 A.2d 1191. In doing so, we noted:

> Our Supreme Court has described "[t]he determination of the existence of a duty ultimately [as] a question of fairness and policy." The facts of a case inform the court in determining whether a duty exists. While foreseeability alone does not create a duty, there can be no duty unless harm to another is reasonably foreseeable.
>
> [*J.S., supra,* 301 *N.J.Super.* at 155, 693 *A.2d* 1191 (quoting *Snyder v. American Ass'n of Blood Banks, supra,* 144 *N.J.* at 292, 676 *A.2d* 1036 (1996)) (citations omitted).]

Further, we noted:

> After "weighing ... the relationship of the parties, the nature of the risk, and the public interest," we conclude that if plaintiffs prove [the wife] was aware of her husband's conduct or history, it was foreseeable that he posed a danger to these young girls, and it is fair to hold that Mary had a duty to take reasonable steps to protect them from such danger.... It will be a jury's role to determine the specific contours of her duty, and whether she deviated therefrom, based upon its findings as to the extent of her knowledge and the foreseeability of harm.
>
> [*Id.* at 156, 693 A.2d 1191 (quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.2d* 291 (1962)).]

*Cf. Linebaugh v. Hyndman,* 213 *N.J.Super.* 117, 121, 516 *A.2d* 638 (App.Div.1986), *aff'd o.b.,* 106 *N.J.* 556, 524 *A.2d* 1255 (1987) (" '[a]n abnormally [vicious] domestic animal is like an artificial [dangerous] condition on the property,' " so that where a landlord, "either by his affirmative consent or by his failure to take curative measures, permits another to" have such an animal in areas under his control, he is liable to the tenants or their invitees for injuries caused by the animal.); *Stuyvesant Assocs. v. Doe,* 221 *N.J.Super.* 340, 345–46, 534 *A.2d* 448 (Law Div.1987) (landlord may be liable for injuries to third persons by tenant who is known to act violently when tenant fails to take medication and thus should evict tenant.).

■ Here, construed most favorably for plaintiff, the evidence would support a reasonable inference that Efstathia was aware of her husband's violent behavior when he did not take his medicine. She certainly knew of the 1985 choking incident, as she was the victim. She knew that George had been diagnosed as being manic depressive and needed his medication. She knew he was not taking it and told the police that he again was becoming assaultive. Yet she did not warn plaintiff of this when she asked for his help and, just before the confrontation, asked him into her house. Certainly under these circumstances the risk of harm to plaintiff, not to mention herself, was "reasonably within the range of apprehension, of injury to another person. . . ." *See Clohesy v. Food Circus Supermarkets, Inc., supra,* 149 *N.J.* at 503, 694 *A.*2d 1017 ("[f]oreseeability as it impacts duty determinations refers to 'the knowledge of the risk of injury to be apprehended.' "); *Hill v. Yaskin,* 75 *N.J.* 139, 144, 380 *A.*2d 1107 (1977) ("foresight of harm lies at the foundation of the duty to use care and therefore of negligence.").

■ Defendants assert, however, that plaintiff was aware of the "dangerous condition" and thus Efstathia had no duty to warn. *Berger v. Shapiro,* 30 *N.J.* 89, 99, 152 *A.*2d 20 (1959). In this respect, they assert in their brief "[i]t is manifest that the glass table, on which plaintiff . . . injured himself, was not an undiscoverable defect" and that, as to George's "mental condition," plaintiff knew of that condition and knew that George was not taking his medication. It is, of course, not the glass table that is at issue. More to the point, all that plaintiff knew as to George's "condition," at least viewing the evidence most favorably for plaintiffs, was that George was not taking his medication, that he was losing control "somehow," and was "a little bit upset" on the day in question. This is simply insufficient to support a conclusion that plaintiff could have known that George would become violent and confrontational on May 20, 1993 so as to absolve Efstathia of a duty of care when she asked plaintiff for assistance.

## II

The motion judge granted the summary judgment as to George because, it seems, he thought there was no proximate causation. In this respect, he concluded that "there is no causal relationship between [George's] failure to take the medicine and the man's foot getting caught on the table." The judge seemed to be particularly troubled by plaintiff's not being sure how it happened that he fell into the table, observing "[i]f he says that somebody pushed him or somebody hit him, that's . . . entirely different." But whether plaintiff knows how his foot went through the glass table is not dispositive of the issue of causation. *See Berger v. Shapiro, supra,* 30 *N.J.* at 101, 152 *A.*2d 20 (a jury can draw reasonable inference of causation even though plaintiff did not know or see where she stepped when she fell).

Ordinarily, questions of proximate cause are for the trier of fact. *Yun v. Ford Motor Co.,* 143 *N.J.* 162, 669 A.2d 1378 (1996), reversing on dissent of Judge Baime, 276 *N.J.Super.* 142, 158, 160, 647 A.2d 841 (App.Div.1994). "The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective 'realm of foreseeability.'" 276 *N.J.Super.* at 159, 647 *A.*2d 841 (citations omitted). Foreseeability that relates to proximate cause (as distinguished from that relating to a duty of care) involves "'the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff' reasonably flowed from the defendant's breach of duty." *Clohesy v. Food Circus Supermarkets, Inc., supra,* 149 *N.J.* at 503, 694 *A.*2d 1017 (quoting *Hill v. Yaskin, supra,* 75 *N.J.* at 143, 380 *A.*2d 1107).

To be sure, "'[a] foreseeability test . . . is not intended to bring within the scope of the defendant's liability every injury that might possibly occur. 'In a sense, in retrospect almost nothing is entirely unforeseeable.' Foreseeability means that which it is objectively reasonable to expect, not merely, what might conceivably occur.'" *Yun v. Ford Motor Co., supra,* 143 *N.J.* at 166, 669 *A.*2d 1378 (Garibaldi, J., dissenting). Thus, "[t]he actor's conduct

may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." *Restatement (Second) of Torts* § 435(2) (1965). *See Jensen v. Schooley's Mountain Inn, Inc.*, 216 *N.J.Super.* 79, 82, 522 *A.*2d 1043 (App.Div.), *certif. denied*, 108 *N.J.* 181, 528 *A.*2d 11 (1987) (serving alcohol to visibly intoxicated patron was not a proximate cause of injuries sustained when the patron subsequently drove his car eight miles, parked, climbed a tree, fell out of the tree, rolled into the river and drowned.).

■ We can not say here that George's reactions when confronted with plaintiff's and his wife's efforts to give him his medication and its consequences were "highly extraordinary." A jury well could conclude that harm to plaintiff was reasonably to be expected and thus George's failure to take his medication was a substantial factor in the harm that occurred. As observed in *Stuyvesant Assocs. v. Doe, supra*, 221 *N.J.Super.* at 344–45, 534 *A.*2d 448:

> A [schizophrenic] ... [n]ot having [taken his medication] allowed himself to become psychotic, with the resulting damage done by his own hands. He is liable for the consequences of that conduct. Perhaps he did not intend to tempt the fate of becoming psychotic, or intend the damage that resulted as a consequence, but it is obvious that he was the person who allowed the condition to result, with the consequent damage.... his having allowed the condition was the reasonably foreseeable consequence of his acts....

To this, we simply add that in many respects, plaintiff could be likened to a rescuer responding to a dangerous situation and George, not to mention Efstathia, the creator of the dangerous situation. In this respect, we have held that "where a danger has been negligently created, ... the intervention of a rescuer [and the consequences] is reasonably foreseeable...." *Eyrich v. Dam*, 193 *N.J.Super.* 244, 256, 473 *A.*2d 539 (App.Div.), *certif. denied*, 97 *N.J.* 583, 483 *A.*2d 127 (1984). *See Blackburn v. Broad St. Baptist Church*, 305 *N.J.Super.* 541, 545–46, 702 *A.*2d 1331, 1333 (App.Div. 1997); *Tornatore v. Selective Ins. Co. of Am.*, 302 *N.J.Super.* 244, 252, 695 *A.*2d 313 (App.Div.1997); *Burns v. Market Transition*

*Facility,* 281 *N.J.Super.* 304, 310, 657 *A.*2d 472 (App.Div.1995). As the oft repeated observation of Justice Cardoza goes:

Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer.... The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man.

[*Wagner v. International Ry. Co.,* 232 *N.Y.* 176, 180, 133 *N.E.* 437 (1921).].

George initiated danger here by not taking his medication, just as did Efstathia by requesting plaintiff's assistance in a potentially explosive situation and without warning him. We see no reason why their responsibility to plaintiff should not be determined by a jury.

Reversed and remanded for further proceedings consistent with this opinion.